UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
┌──────────────────────────────────────────┐
│ USDC SDNY                                  │
│ DOCUMENT                                   │
│ ELECTRONICALLY FILED                       │
│ DOC #:_____                       │
│ DATE FILED:   9/29/2025                     │
└──────────────────────────────────────────┘
```

CHARLES DOHERTY, *et al.*,

                                    Plaintiffs,

                    -against-

BRISTOL-MYERS SQUIBB CO., *et al.*,

                                    Defendants.

24-CV-06628 (MMG)

**OPINION & ORDER**

MARGARET M. GARNETT, United States District Judge:

Plaintiffs Charles Doherty and Michael J. Noel bring this Employee Retirement Income Security Act ("ERISA") action, on behalf of themselves and a putative class of similarly situated persons, against the Bristol-Myers Squibb Company ("Bristol-Myers"), Bristol-Myers Squibb Company Pension Committee (the "Pension Committee"), and Bristol-Myers Squibb Compensation and Management Development Committee (the "Management Committee") (together, the "BMS Defendants"), and State Street Global Advisors Trust Company ("State Street"). Plaintiffs were former participants in the Bristol-Myers Squibb Retirement Income Plan (the "Plan"), a defined benefit pension plan protected by ERISA. ERISA imposes duties of loyalty and prudence on fiduciaries of a plan and bars fiduciaries from participating in certain prohibited transactions. Plaintiffs allege that Defendants violated the duties of loyalty and prudence and engaged in prohibited transactions by purchasing an annuity from the Athene Annuity and Life Company and Athene Annuity & Life Assurance Company of New York (collectively "Athene") as a means of terminating the Plan (the "Athene transaction").

Before the Court are the BMS Defendants' and State Street's motions to dismiss Plaintiffs' consolidated complaint ("Complaint" or "Compl."). Dkt. No. 45. For the following

1

reasons, each motion is GRANTED IN PART and DENIED IN PART: specifically, Counts V,

VI, and VII are dismissed and the motions are denied in all other respects.[1]

## BACKGROUND

### I.    RELEVANT FACTS[2]

ERISA protects the security of retirement benefit pension plans.  The act requires that all

assets of a pension plan be held in trust, 29 U.S.C. § 1103(a), and it imposes stringent duties on

fiduciaries to manage and safeguard those assets, including duty of loyalty and duty of prudence.

29 U.S.C. § 1104(a).  These duties principally require a "fiduciary [to] discharge his [or her]

duties with respect to a plan solely in the interest of the [plan] participants and beneficiaries."  29

U.S.C. § 1104(a).

Broadly speaking, pension plans come in two forms:  defined-contribution plans and

defined-benefit plans.  A defined-benefit plan like that at issue in this case entitles a retiree to

receive a fixed payment every month.  Compl. ¶ 57.  The benefit payments are funded by assets

that an employer-sponsor contributes and invests as part of the trust.  *Id.*  The amount a retiree

receives is fixed and does not fluctuate with the number or value of assets held in trust.  And an

employer-sponsor is obligated to pay a retiree his or her monthly benefits regardless of how

---

[1] Also before the court are three motions for leave to file amicus briefs—two in support of Defendants and one in support of Plaintiffs. Dkt. Nos. 57, 68, & 79.  "District courts have broad discretion to permit or deny the appearance of amici curiae in a given case."  *United States v. Yaroshenko*, 86 F. Supp. 3d 289, 290 (S.D.N.Y. 2015) (quoting *United States v. Ahmed*, 788 F. Supp. 196, 198 (S.D.N.Y. 1992)).  Pursuant to that discretion, the Court will DENY the motions for leave to file amicus briefs.  Dkt. Nos. 57, 68, 79.  Counsel for the Parties have more than adequately briefed all the issues before the Court.  Accordingly, amicus briefs will not assist the Court in understanding or resolving the issues presented in the motions that are resolved by this Opinion.  *See Ahmed*, 788 F. Supp. at 198 n.1 (denying leave to file an amicus brief because a defendant's interest was adequately represented by counsel).

[2] The following facts are taken from the allegations in the Complaint and are assumed true for the purpose of resolving these motions.  The Court shall refer to the parties' memoranda of law in support of and opposition to the motions to dismiss as follows: Dkt. No. 47 ("State Street Mot."); Dkt. No. 51 ("BMS Mot."); Dkt. No. 66 ("Opp."); Dkt. No. 69 ("State Street Reply"); & Dkt. No. 70 ("BMS Reply").

poorly or how well the investments perform. *Id.* ¶ 58. In ERISA-protected plans, if an employer-sponsor goes bankrupt or is unable to pay promised benefits, a federal entity called the Pension Benefit Guaranty Corporation (the "PBGC") becomes obligated to pay all or most of the outstanding benefits. *Id.* ¶¶ 9, 60.

ERISA permits an employer-sponsor to terminate a retirement plan by purchasing a replacement annuity. 29 U.S.C. § 1341(b)(3)(A)(i). In this context, the annuity is a contract whereby a plan sponsor transfers plan assets to a third party in exchange for the third party assuming the obligation to pay beneficiaries their promised retirement benefits. Compl. ¶ 5. In the pension industry, the transfer of a plan's assets is a called a "Pension Risk Transfer," or "PRT." *Id.* ¶ 7. ERISA imposes requirements on a sponsor who wishes to terminate a plan by annuitization. For example, 29 U.S.C. § 1058 prohibits annuitization except where beneficiaries receive a benefit "immediately after the . . . transfer which is equal to or greater than the benefit he [or she] would have been entitled to receive immediately before the . . . transfer." Once a plan sponsor purchases an annuity, the retirement plan terminates. Plan participants and beneficiaries are removed from ERISA's protections. Any surplus assets that remain after the annuitization transaction revert to a plan's sponsor. Compl. ¶¶ 18, 26. In addition, once an ERISA plan is replaced by an annuity, the promised pension benefits are no longer protected by the PGBC and are instead protected by state guaranty associations ("SGAs"). *Id.* ¶ 67. SGAs are non-profit organizations that act as a backstop for annuity payments if the issuer cannot meet its financial obligations; insurance companies that issue annuities are required to belong to the SGA in each state where they do business. *Id.* ¶ 69; *see also* www.annuity.org/annuities/regulations/state-guaranty-associations/ (last visited September 24, 2025). SGAs regularly cap

3

the amount of benefit payments they can offer a given participant in the event of a default. *Id.*; Compl. ¶ 69.

Defendant Bristol-Myers is a multinational pharmaceutical company valued at over $100 billion. *Id.* ¶ 40. Bristol-Myers offered qualifying employees retirement benefits via the Plan. *Id.* ¶ 2. Bristol-Myers' Management Committee "exercised discretionary authority and responsibility over the Plan, including by appointing, monitoring, and overseeing the Pension Committee." *Id.* ¶ 41. And Bristol-Myers' Pension Committee functioned as the Plan's administrator. *Id.* ¶ 42. In or around November 2018, the BMS Defendants decided to pursue an annuity to terminate the Plan and hired Defendant State Street to assist in selecting an annuity provider. *Id.* ¶¶ 173–74. State Street "is a company formed to facilitate State Street Bank and Trust Company's asset management business and State Street Global Advisors' U.S. institutional investment management business." *Id.* ¶ 43. State Street ultimately recommended that Bristol-Myers purchase an annuity from Athene. *Id.* ¶¶ 43, 182. Athene comprises two Bermuda-based reinsurers that conducted their first PRT in August of 2017. *Id.* ¶¶ 105, 227. The BMS Defendants consented to the selection of Athene and ultimately proceeded to conduct a PRT transferring to Athene $2.6 billion in annuitized pension benefits. *Id.* ¶¶ 182–85. The benefits were "offloaded in two tranches: one in August 2019 and one in October 2019, while the Plan was terminated effective February 1, 2019." *Id.* ¶ 185. Bristol-Myers used Plan assets to purchase the annuity contract, *id.* ¶ 192, and to pay State Stret, *id.* ¶ 193. Bristol-Myers retained approximately $800 million in "surplus" Plan assets after the transaction, which it used for other corporate purposes. *Id.* ¶¶ 201–202.

Plaintiffs are former Bristol-Myers employees who qualified as participants in the Plan. Plaintiff Charles Doherty worked for Bristol-Myers from 1986 until 2000 and earned pension

4

benefits in the Plan. *Id.* ¶ 38.  Plaintiff Michael J. Noel began working for Bristol-Myers in 2001 when it acquired his former employee DuPont Pharmaceuticals Company, for whom Noel worked for 17 years. *Id.* ¶ 39.  Noel then worked for Bristol-Myers until he retired in 2019, having earned pension benefits in the Plan. *Id.*

Plaintiffs contend that Bristol-Myers chose to pursue an annuitization of the Plan to increase its profits and offload its obligations to cover retirement benefits promised to its employees. *Id.* ¶¶ 3, 183–184.  They argue that Bristol-Myers hired State Street to provide legal cover for an otherwise legally deficient annuitization process. *Id.* ¶ 177.  They contend that State Street recommended Athene as an annuity provider, not because it was the best option for Plan participants, but to bolster its business ties with Athene and with the private equity company Apollo Global Management ("Apollo"), which later acquired Athene. *Id.* ¶ 235.  They allege that Bristol-Myers chose to purchase an annuity from Athene not because Athene offered a secure annuity but because Athene offered the cheapest annuity contracts on the market, which let Bristol-Myers capture additional surplus assets once the Plan terminated. *Id.* ¶ 198.  And the Complaint avers that Athene is a high-risk insurer and that—by selecting Athene—the BMS Defendants and State Street violated their fiduciary duties to the Plan and jeopardized the safety of Plaintiffs' retirement benefits. *Id.* ¶¶ 98–172 (describing Athene's risk factors and other allegations supporting the riskiness of the transaction).

## II.    PROCEDURAL HISTORY

Doherty filed a complaint on September 3, 2024.  Dkt. No. 1.  On October 23, 2024, the Court entered an order consolidating Doherty's action with a substantially similar action filed by Noel titled *Noel v. Bristol-Myers Squibb Co., et al.*, No. 24-cv-06858.  *See* Dkt. No. 39. Plaintiffs filed their consolidated Complaint against all Defendants on November 4, 2024.  Dkt.

No. 45.  The BMS Defendants and State Street both moved to dismiss the Complaint pursuant to

Rules 12(b)(1) and (b)(6) of the Federal Rules of Civil Procedure on January 15, 2025.  *See* Dkt.

Nos. 46 & 50.  In the motions, Defendants argue that Plaintiffs lack Article III standing to bring

this action and allege various other infirmities concerning the Complaint's eight counts.

Additionally, the Court received three motions for leave to file amicus briefs either supporting or

opposing Defendants' motions to dismiss.  *See* Dkt. Nos. 57, 68, 79.[3]

**DISCUSSION**

As discussed further below, Plaintiffs have shown an injury necessary to confer Article

III standing at this stage of the case because they have sufficiently alleged that the Athene

transaction created a substantial risk that Plaintiffs will not receive their benefits and that the

Athene transaction diminished the value of Plaintiffs' benefits.  The Court will grant the motions

to dismiss as to Counts V, VI, and VII on grounds other than standing and otherwise deny the

remainder of the motions.

## I.    LEGAL STANDARD ON A MOTION TO DISMISS

To survive a motion to dismiss under Rule 12(b)(1), Plaintiffs bear the burden of clearly

alleging facts demonstrating each element of standing.  *Warth v. Seldin*, 422 U.S. 498, 517–18

(1975).[4]  A plaintiff must make out the standing requirements "with the manner and degree of

evidence required at the successive stages of the litigation."  *Lujan v. Defenders of Wildlife*, 504

U.S. 555, 561 (1992).  Relevant to this case, "[a]t the pleading stage, general factual allegations

of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we

presume[e] that general allegations embrace those specific facts that are necessary to support a

---

[3] As explained *supra* n.1, these motions are denied.

[4] Unless otherwise indicated, case quotations omit all internal citations, quotation marks, footnotes and omissions, and adopt alterations.

6

claim." *Id.*  And "[f]or purposes of ruling on a motion to dismiss for want of standing, [the trial court] must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Warth*, 422 U.S. at 501.  But the Court "need not credit a complaint's conclusory statements without reference to its factual context." *Connecticut Parents Union v. Russell-Tucker*, 8 F.4th 167, 172 (2d Cir. 2021).

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A complaint is properly dismissed where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558.  The Court must assume all well-pled facts to be true, "drawing all reasonable inferences in favor of the plaintiff." *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012); *see also A.I. Trade Fin., Inc. v. Petra Bank*, 989 F.2d 76, 79–80 (2d Cir. 1993) ("[A]ll allegations are construed in the light most favorable to the plaintiff and doubts are resolved in the plaintiff's favor, notwithstanding a controverting presentation by the moving party.").  However, the Court need not accept conclusory assertions. *Whiteside v. Hover-Davis, Inc.*, 995 F.3d 315, 321 (2d Cir. 2021).

Finally, on a Rule 12 (b)(6) motion, a court "may review only a narrow universe of materials." *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016).  That universe includes "the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *United States ex rel. Foreman v. AECOM*, 19 F.4th 85, 106 (2d Cir. 2021).  For motions brought pursuant to Rule 12(b)(1), "a district court may

refer to evidence outside the pleading," but is only required to do so "where jurisdictional facts are placed in dispute." *Harty v. W. Point Realty, Inc.*, 28 F.4th 435, 441 (2d Cir. 2022).

## II.    PLAINTIFFS HAVE SHOWN ARTICLE III INJURY SUFFICIENT TO CONFER STANDING

Article III of the Constitution grants the judicial branch power over "Cases" and "Controversies." Art III, § 2. Standing doctrine derives from the traditional understanding of these terms and serves to "ensure that federal courts do not exceed their authority." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). Article III standing consists of three elements. First, a plaintiff must suffer an injury in fact. Second, the injury must be traceable to challenged conduct of the defendant. And third, the injury must be redressable by a favorable judicial ruling. *See Lujan*, 504 U.S. at 560–61. Defendants[5] challenge whether Plaintiffs have shown the first element, an injury in fact, only. The Court limits its analysis in kind.

To demonstrate injury in fact, a plaintiff's injury must involve "'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo, Inc.*, 578 U.S. at 339 (quoting *Lujan*, 504 U.S. at 560). Violation of a statutory right, standing alone, does not automatically constitute an injury in fact, because the Constitution—not Congress—defines the limits of judicial authority. *Thole v. U.S. Bank N.A.*, 590 U.S. 538, 544 (2020). Nevertheless, "the judgment of Congress play[s an] important role[]" in this analysis "because Congress is well positioned to identify intangible harms that meet minimum Article III requirements." *Spokeo, Inc.*, 578 U.S. at 340–41; *see also Lujan*, 504 U.S. at 580 ("Congress has the power to define injuries and articulate chains of causation that will

---

[5] All Defendants have moved to dismiss the Complaint for lack of standing. However, State Street's motion relies entirely on the arguments made in the BMS Defendants' memorandum of law, *see* State Street Mot. at 4, and does not separately brief the issues or make different arguments. Accordingly, when discussing specific arguments made, this section at times refers only to the BMS Defendants. The Court's ruling on standing, however, applies equally to all Defendants.

give rise to a case or controversy where none existed before . . . .") (Kennedy, J., concurring).

Additionally, because standing doctrine is grounded in historical practice, courts may look to

whether an injury can be analogized to a claim at common law. *See Vermont Agency of Natural*

*Resources v. United States ex rel. Stevens*, 529 U.S. 765, 775–77 (2000). A litigant has standing

to bring a claim cognizable at common law or bearing a "close relationship" to a harm

traditionally recognized historically or at common law. *TransUnion LLC v. Ramirez*, 594 U.S.

413, 433 (2021). "In looking to whether a plaintiff's asserted harm has a 'close relationship' to a

harm traditionally recognized [at common law] . . ., we do not require an exact duplicate." *Id.*

    For the following reasons, at this stage of the proceeding and based on Plaintiffs' well-

pleaded complaint, Plaintiffs have shown a sufficient injury to confer Article III standing.

Accordingly, both Defendants' Rule 12(b)(1) motions are denied.

### A. The Complaint Adequately Alleges a "Substantial Risk" that Athene Will Default, Jeopardizing Plaintiffs' Promised Benefits

    Plaintiffs contend they have standing to sue because there is a substantial risk that

Athene will default and that, as a result, Plaintiffs will not receive their benefits. Opp. at 11–12,

25–29. "An allegation of future injury may suffice" for standing purposes if a litigant can show

"there is a substantial risk that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573

U.S. 149, 158 (2014). No party disputes that if Plaintiffs do not receive their pension benefits

they will have suffered an injury for purposes of Article III. *Thole*, 590 U.S. at 541 (recognizing

that if retirees do "not receive[] their vested pension benefits, they would of course have Article

III standing to sue"). Hence, the sole issue is whether the Athene transaction exposed Plaintiffs

to a "substantial risk" of that harm occurring, such that they can bring their suit based on that

transaction rather than waiting until their promised benefits do not arrive. *Susan B. Anthony List*,

573 at 158. Because the Court concludes that Plaintiffs have adequately pled a substantial risk of

Athene defaulting and Plaintiffs not receiving their full promised pension benefits, Plaintiffs have shown an injury necessary to confer standing.[6]

The Complaint contains a litany of allegations that speak to the dangers, volatility, and risks surrounding Athene's fiscal health. Plaintiffs allege that Athene is one of a group of "new Risk-Taking Insurers" defined by a "greater prominence of illiquid and volatile assets," Compl. ¶ 92, that are more likely than traditional annuity providers "to become insolvent now and in the future," *id.* ¶ 93. They cite a report flagging a trend of unstable "Risk-Taking Insurers" that filled a void left by banks in the risky corporate markets since the 2008 financial crisis, which specifically identifies Athene as an example of one such "Risk-Taking Insurer." *Id.* ¶ 96–97.

The Complaint argues that the private equity giant Apollo's ownership of Athene increases Athene's riskiness because private equity firms seek to maximize short term profit at the cost of long-term security. *Id.* ¶ 91–94 & 98. Furthermore, the Complaint alleges that 80% of Athene's PRT "liabilities are reinsured through Bermuda-based affiliates owned by Apollo." *Id.* ¶ 101. This poses dual risks, the Complaint alleges. First, "[w]hereas arm's-length reinsurance, with pricing set by the marketplace, can improve policyholder security by diversifying and sharing fully transparent risk with strong, independent financial partners, reinsurance with a commonly-owned affiliate allows for self-dealing, as pricing is not set by the marketplace," thereby increasing risk and potentially jeopardizing annuitants' security. *Id.* ¶ 111. And second, because Bermuda requires reinsurers to maintain less capital than U.S. law requires of domestically based insurers, Athene's reinsurers are less likely to be able to cover

---

[6] Second Circuit precedent suggests, without deciding the issue, that a mere substantial *increase* in risk may suffice to confer standing, as well. *See McMorries v. Carlos Lopez & Associates, LLC*, 995 F.3d 295, 301 (2d Cir. 2021) (discussing an "increased-risk" theory); *Thole*, 590 U.S. at 546 (describing a "theory of standing" entailing a "substantially increas*ed* risk") (emphasis added). The Court need not determine whether a mere increase in risk of harm suffices to confer standing because Plaintiffs have plausibly alleged that Athene is at substantial risk of default, endangering Plaintiffs' retirement benefits.

Athene's debts in the event of a default. *Id.* ¶ 111–12. The Complaint also cites that a whopping 25% of Apollo's subsidiaries eventually default. *Id.* ¶ 102.

The Complaint describes four risk factors that industry experts use to assess an annuity's risk profile, *id.* ¶ 114, and explains how each risk factor raises extreme red flags concerning Athene. As just one example, concerning the first factor, "adequate surpluses relative [to] the carrier's size and risk profile," the Complaint explains that Athene maintains "among the thinnest surpluses" of any active insurance carrier, ranked at the 689th lowest surplus-to-risk ratio out of 695 active insurance carriers. *Id.* ¶ 117. Finally, the Complaint identifies similarities between Athene and recently failed insures "based on objective measures," including comparable surplus-to-liability ratio, *id.* ¶¶ 146–147, and engagement in affiliated reinsurance far exceeding its surplus, *id.* ¶ 148.

Accepting these facts as true and drawing all inferences in Plaintiffs' favor, as required at this stage of the litigation, these allegations suffice to show that the Athene transaction put Plaintiffs at a substantial risk of losing their benefits. In sum, Athene maintains one of the lowest surplus-to-risk ratios of all general insurance companies, an apparently key indicator of riskiness. It maintains a high proportion of volatile, non-liquid investments in its portfolio. Both it and its reinsurers—all based in Bermuda, a jurisdiction with relatively relaxed regulations for insurance, *id.* ¶ 105 —are owned by Apollo, 25% of whose subsidiaries default. And Athene has not "been tested through a full economic cycle and [has] never weathered a recession," *id.* ¶¶ 93. 100, a fact made more worrying by the other risk factors identified above. The Complaint as a whole sufficiently alleges that there is a substantial risk that Athene could default on its obligations and Plaintiffs will not receive their legally entitled benefits. Accordingly, Plaintiffs have shown an injury necessary to sustain Article III standing.

The BMS Defendants' challenge to this conclusion relies on documents extrinsic to the Complaint to show that Plaintiffs have not sufficiently plead a substantial risk of harm. *See* BMS Mot. at 15. Specifically, the BMS Defendants point to a contractual provision requiring Athene to maintain a "separate account containing assets sufficient to support the liabilities underlying the annuity contract." *Id.* While the Court must consider extrinsic evidence in ruling on a 12(b)(1) motion in certain circumstances, *see Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 57 (2d Cir. 2016), it need not do so here. Plaintiffs specifically addressed the requirement that Athene maintain a separate account in their Complaint, alleging that "this separate account is not truly 'ring-fenced or insulated from Athene's general liabilities" because the assets in the account "may also be used to support Athene's payment obligations under other, separate group annuity contracts" and "Athene has the right to, periodically, withdraw assets from the separate account and transfer them to its general account." Compl. ¶ 134. Thus, the extrinsic evidence provided by the BMS Defendants "does not controvert the material allegations of the complaint," and the Court may thus "base its ruling solely on the allegations of the complaint." *Harty*, 28 F.4th at 441.[7]

The BMS Defendants elsewhere argue that Plaintiffs have only shown that Athene is risky relative to other insurers, but do not "plausibly establish a substantial risk that *Athene* will default." BMS Reply at 5. Plaintiffs, however, discussed in detail four industry risk-factors and

---

[7] Additionally, the BMS Defendants made a facial challenge, which does not require the Court to scrutinize facts beyond the pleading. *Carter*, 822 F.3d at 56–57. Furthermore, the extrinsic documents the BMS Defendants sought to introduce do not contradict Plaintiffs' factual allegations but instead seek to introduce new facts to controvert the conclusion those factual allegations are intended to support, i.e., that Athene is at a substantial risk of default. *See id.* at 57 ("[T]he plaintiffs are entitled to rely on the allegations in the Pleading if the evidence proffered by the defendant . . . does not contradict plausible allegations that are themselves sufficient to show standing.").

how Athene flunks each of them. *See* Compl. ¶¶ 114–126. And Plaintiffs highlight several "objective" similarities between Athene and reinsurers that defaulted in 2024. *Id.* ¶¶ 146–48. At this stage of the proceeding, drawing all inferences in favor of Plaintiffs, these allegations describe a substantial risk sufficient to make out an Article III injury.

The BMS Defendants also argue that Plaintiffs "fail[] to identify any allegations plausibly suggesting that the named Plaintiffs would be unable to recover the full amount of their benefits from an SGA." BMS Reply at 7. But the Complaint explains that, as of 2019, 93% of the Plan's participants had not yet begun to receive benefits. Compl. ¶ 188–89. This supports an inference that most of the participants are relatively young and will receive annuity payments long into the future.[8] Additionally, the Complaint explained that SGAs are capped by state law, that in some states the cap is so low that "pensioners with the right to receive their retirement benefits for many decades . . . could exhaust their allotments within mere years," and that annuity beneficiaries in some states automatically lose up to 20% of their benefits when their insurer becomes insolvent. Compl. ¶ 68. Accepting these allegations as true, it is a reasonable inference that the SGAs—which offer some protection but are insufficient to cover years of pension annuity payments, let alone decades of such payments—cannot adequately protect Plaintiffs or their putative class.

### B. The Reduction in Protections and Guarantees Caused by the Athene Transaction Provides a Separate Basis for Article III Standing

In addition to arguing that the Athene transaction exposed them to a substantial risk of losing at least some of their benefits, Plaintiffs argue that the "Athene transaction transformed Plaintiffs' right to receive their benefits from the Plan, inside ERISA's regime, into a promise

---

[8] Even among the named plaintiffs, Plaintiff Noel retired just six years ago, suggesting a strong likelihood that he has at least a decade of pension benefit payments still to come.

that Athene will make annuity payments." Opp. at 18. They further contend that "[t]hat transformation diminished the value of Plaintiffs' benefits when it occurred because an interest in annuity payments from Athene is worth substantially less than an interest in pension benefits from the Plan." *Id.* This diminished value, they argue, constitutes an injury under Article III. *Id.* The Court agrees.

This conclusion flows from the basic premise that—all else being equal—an agreement or contract for monthly payments with a panoply of robust protections and guarantees is objectively more financially valuable than a contract for the same monthly payments with unambiguously weaker protections and guarantees. Given the allegations discussed at length above, including those related to the materially different risk profile of Athene vs. Bristol-Myers, the Complaint adequately pleads that the Athene transaction deprived Plaintiffs of the former in exchange for the latter. And that diminution in value represents a tangible economic injury.

Participants in an ERISA-governed plan have at least a quasi-contractual right to their benefits and enjoy multiple protections. *See Thole*, 590 U.S. at 542–43 ("[A] defined-benefit plan is more in the nature of a contract."); *Nachman Corp. v. Pension Ben. Guaranty Corp.*, 446 U.S. 359, 370 (1980) (discussing that "employees' benefits are 'vested in a contractual sense'"). *See also* Compl. ¶ 36 (pension benefits "were part of workers' employment bargain with Bristol-Myers" and were "earned through their service to Bristol-Myers"). ERISA requires that retirement assets be held in trust, 29 U.S.C. §§ 1103(a), (c)(1), and it imposes on trustees and other plan managers fiduciary duties of a caliber that are "the highest known to the law," *LaScala v. Scrufari*, 479 F.3d 213, 219 (2d Cir. 2007); *see also Rothstein v. Am. Int'l Grp., Inc.*, 837 F.3d 195, 208 (2d Cir. 2016) (ERISA fiduciaries must act with an "eye single to the interests of the [plan's] participants and beneficiaries"). ERISA authorizes the Department of Labor to

enforce these fiduciary obligations. 29 U.S.C. § 1132(a)(2). "And the Department of Labor has a substantial motive to aggressively pursue fiduciary misconduct, particularly to avoid the financial burden of failed defined-benefit plans being backloaded onto the Federal Government." *Thole*, 590 U.S. at 545. ERISA also provides beneficiaries multiple causes of action to sue in federal court and seek remedies. *See* 29 U.S.C. § 1132. And "[w]hen a defined-benefit plan fails and is unable to pay benefits to retirees, the federal [PBGC] is required by law to pay the vested pension benefits of the retirees." *Thole*, 590 U.S. at 545.

The Athene transaction ejected Plaintiffs from the ambit of ERISA and its protections. As the Supreme Court has explained:

> [T]erminating a plan through purchase of annuities . . . formally severs the applicability of ERISA to plan assets and employer obligations. Upon purchasing annuities, the employer is no longer subject to ERISA's multitudinous requirements . . . . And the PBGC is likewise no longer liable for the deficiency in the event that the plan becomes insolvent; there *are* no more benefits for it to guarantee. The assets of the plan are wholly removed from the ERISA system, and plan participants and beneficiaries must rely primarily (if not exclusively) on state contract remedies if they do not receive proper payments or are otherwise denied access to their funds.

*Beck v. PACE Intern. Union*, 551 U.S. 96, 106 (2007). As a result of the Athene transaction, Plaintiffs lost an ERISA plan (and all the protections it entailed) in exchange for a promise to receive payments by Athene, a promise that Plaintiffs allege has a materially different economic value than the promise they bargained for from Bristol-Myers. Athene does not owe stringent fiduciary duties meant to safeguard Plaintiffs' retirements. The Department of Labor is not charged with policing Athene's conduct (nor would it have the "substantial motive" to do so described in *Thole*, 590 U.S. at 545). Plaintiffs lack a federal cause of action to challenge Athene's conduct as annuity provider. *Hallingby v. Hallingby*, 574 F.3d 51, 56 (2d Cir. 2009).

15

And Plaintiffs' only safety net are the SGAs, which Plaintiffs have already alleged are statutorily capped or lack adequate funds to provide years of pension payments.  Compl. ¶ 68.

The Second Circuit's decision in *Ross v. Bank of American, N.A.* offers a ready analogy to this case.  524 F.3d 217 (2d Cir. 2008).  There, a group of plaintiffs alleged that banks anticompetitively conspired to only offer cards on terms requiring arbitration and disallowing class actions.  *Id.* at 221.  The Second Circuit held that the conspiracy diminished the value of the cards and thus constituted an Article III injury.  Because of the conspiracy, the Second Circuit reasoned, "the cardholders will be forced to expend time and legal fees to monitor the legality of the banks' behavior, whereas if the cardholders had access to a card that permitted class actions, they would have the option of relying on motivated class action attorneys to perform this function."  *Id.* at 224.  Additionally, the Second Circuit highlighted that a "card that limits the holder to arbitration is less valuable (all other factors being equal) than a card that offers the holder a choice between court action or arbitration."  *Id.*  The bank's anticompetitive conduct injured the plaintiffs because the plaintiffs "receiv[ed] objectively less valuable cards than would otherwise have been the case."  *Id.*

The same is true here.  Whereas before the Athene transaction Plaintiffs could rely on the Department of Labor to "aggressively pursue fiduciary misconduct," *Thole*, 590 U.S. at 545, Plaintiffs must now expend time and resources monitoring Athene and filing a claim should the need arise.  Additionally, and again like in *Ross*, the Athene transaction limited the remedies available to Plaintiffs.  Plaintiffs no longer have a federal cause of action because ERISA does not apply, *Beck*, 551 U.S. at 106, nor would a lawsuit challenging non-payment by Athene present federal question jurisdiction, *Hallingby*, 574 F.3d at 56.   In other words, Plaintiffs now lack access to remedies provided by ERISA to protect their pension benefits and instead must

"rely primarily (if not exclusively) on state contract remedies if they do not receive proper payments or are otherwise denied access their funds." *Beck*, 551 U.S. at 106.

Next, Congress's determination supports that Plaintiffs suffered an Article III injury.  In assessing whether an intangible harm comprises an Article III injury, Congress "play[s] an important role" because "Congress is well positioned to identify intangible harms that meet minimum Article III requirements." *Spokeo, Inc.*, 578 U.S. at 340–41.  Congress regarded the security of benefits as intrinsic to their value because one of Congress's animating purposes in passing ERISA was to "make as certain as possible that pension fund assets [will] be adequate" to make benefits payments.  *Nachman Corp*, 446 U.S. at 375; *see also Lockheed Corp. v. Spink*, 517 U.S. 882, 887 (1996) ("[W]hen Congress enacted ERISA it wanted to make sure that if a worker has been promised a defined pension benefit upon retirement—and if he has fulfilled whatever conditions are required to obtain a vested benefit—he actually will receive it."). Accordingly, and while Congress cannot define an Article III injury, Congress's findings on the purpose of ERISA and its provision of a private right of action in this type of situation lends further support to the conclusion that Plaintiffs in this case suffered an Article III injury.  *See* 29 U.S.C. § 1132(a)(9), and discussion *infra* at Part III.

Finally, this determination comports with common sense.  Beneficiaries who will rely on their retirement benefits to support them through their senior years of course have a strong interest in not only the *amount* of their monthly benefits about also the *security* of their monthly benefits.  In or approaching retirement and concerned about the security of their retirement benefits, Plaintiffs doubtlessly have a "concrete stake" in this dispute.  *Baker v. Carr*, 369 U.S. 186, 204 (1962) (explaining that a plaintiff must have a "personal stake in the outcome" of a

lawsuit to have standing); *Thole*, 590 U.S. at 541 (determining that plaintiffs lacked standing because plaintiffs lacked a "concrete stake" in the lawsuit).

The BMS Defendants marshal several arguments challenging Plaintiffs' so-called diminution of value theory. None withstand scrutiny.

The BMS Defendants first argue that *Thole* stands for the premise that Plaintiffs have not suffered an injury unless and until they cease receiving their monthly benefits. *Thole* did not pronounce such a broad rule and in several instances, *Thole* explicitly cabined the scope of its holding. For example, *Thole* did not disavow the premise that a fiduciary's misconduct that substantially increased the risk of default could comprise an injury. *Thole*, 590 U.S. at 546. And it expressly commented that its "decision . . . does not concern suits to obtain plan information." *Id.* at 544 n.1. Accordingly, it does not appear that *Thole* established a baseline rule that former or current plan beneficiaries lack any Article III injury unless they stop receiving monthly benefits.

More fundamentally, *Thole* addressed facts highly distinct from those in this case. In *Thole*, the plaintiffs challenged what they regarded as poor investment decisions by the plan fiduciaries. 590 U.S. at 540–41. But, unlike in this case, the plan fiduciaries in *Thole* did not do anything that affected the nature of the plaintiffs' entitlements to their benefits nor jeopardized in any tangible way the amount of their future benefits. *Id.* The *Thole* court also devoted considerable space to explaining that the plaintiffs could rely on the Department of Labor to police violations of fiduciary duties and could rely on the PBGC as a safety net. *Id.* at 545. This case is starkly different because—due to the Athene transaction—there is no more retirement plan. *Beck*, 551 U.S. at 106; *Hallingby*, 574 F.3d at 56 (determining that a district court "erred in ruling that 'the Annuity contract . . . *constitutes* the pension plan'" because "[t]he purchase of the

18

Annuities instead terminated the Plan"). Furthermore, Plaintiffs do not enjoy any of the safeguards that *Thole* discussed. Plaintiffs were ejected from ERISA. The Department of Labor is not charged with policing Athene's distribution of annuity payments. And Plaintiffs are uninsured by the PGBC. Finally, Plaintiffs advance an entirely different theory of injury than the one *Thole* confronted and ruled on. As a result, *Thole* does not resolve the dispute that is presently before the Court.

The BMS Defendants elsewhere argue that terminating a retirement benefits pension plan cannot constitute an Article III injury because ERISA permits an employer to terminate a retirement benefits pension plan. BMS Reply at 2–3. But that argument conflates Article III standing with the question of whether Plaintiffs can succeed in demonstrating their substantive claim—and in any event ignores the countervailing argument that ERISA also creates a private right of action for annuitization where the transaction violates other protections of ERISA. *See* 29 U.S.C. § 1132(a)(9). More importantly, the argument ignores that Congress cannot efface an Article III injury any more than it can create one. Whether an Article III injury exists depends on the "traditional understanding" of the Constitution's requirement of a "Case" or "Controvers[y]," not solely on whether Congress legislated a particular cause of action. *Spokeo*, 578 U.S. at 338–39.

Under either theory, Plaintiffs have sufficiently alleged an injury necessary to confer Article III standing at this stage of the litigation.

## III. PLAINTIFFS HAVE STATUTORY STANDING TO SUE UNDER ERISA

Plaintiffs allege causes of action arising from 29 U.S.C. §§ 1132(a)(2), (a)(3), and (a)(9). *See* Compl. ¶ 251. The BMS Defendants argue that Plaintiffs' claims under 29 U.S.C. §§ 1132(a)(2) and (a)(3) should be dismissed because "[P]laintiffs are *former*, not current, plan

participants." BMS Mot. at 17.  The Court agrees that Plaintiffs lack causes of action under 29

U.S.C. § 1132(a)(2) and (3).  But this conclusion does not affect the viability of the Complaint

because all counts may proceed under 29 U.S.C. § 1132(a)(9).

Congress provided private rights of action under ERISA in 29 U.S.C. § 1132(a)(1)–(9).

Plaintiffs allege their causes of action under (a)(2), (a)(3), and (a)(9).  In 29 U.S.C. § 1132(a)(2)

and (a)(3), Congress provided a cause of action to a "participant, beneficiary, or fiduciary."  In

Section 1132(a)(9), however, Congress provided a cause of action to "any individual *who was* a

participant or beneficiary" at the time of an annuitization transaction described in the subsection.

(emphasis added).  Because Plaintiffs are individuals who *were* participants or beneficiaries of

the Plan at the time of the challenged Athene transaction, but are not now participants or

beneficiaries of an ERISA plan because the Plan no longer exists, they may not bring a civil

action under § 1132(a)(2) or (a)(3), but their claims on all counts may proceed under

§ 1132(a)(9).[9]

## IV.    THE BMS DEFENDANTS' REMAINING ARGUMENTS

### A.  Challenges to Count I Fail

ERISA imposes fiduciary duties only on those who act "in the capacity of manager,

administrator, or financial adviser to a 'plan,'" not those who act in the capacity of a sponsor.

*Pegram v. Herdrich*, 530 U.S. 211, 222 (2000).  "[A]n employer may, at different times, wear

'hats' as both a sponsor and administrator," *Lee v. Verizon Commc'ns, Inc.*, 837 F.3d 523, 535

(5th Cir. 2016) (quoting *Pegram*, 530 U.S. at 225–26)  and "fiduciary duties under ERISA are

implicated only when it acts in the latter capacity." *Beck*, 551 U.S. at 101.  Count I alleges that

all Defendants breached a fiduciary duty by selecting Athene as the annuity provider.  Compl.

---

[9] Defendants do not appear to contest this basis for statutory standing.

¶¶ 260–71.  The BMS Defendants argue that the Court must dismiss Count I as to them because pursuing a PRT is not a fiduciary act and because none of the BMS Defendants selected Athene as the insurer, State Street did.  BMS Mot. At 18.  These arguments are insufficient to dismiss Count I against any BMS Defendant.  Deciding *whether* to terminate a plan is a sponsor function immune from ERISA liability.  *Beck*, 551 U.S. at 101.  But deciding *how* to terminate a plan is an administrator decision and therefore implicates ERISA's fiduciary duties.  *Id.* at 101–02; *Lee*, 837 F.3d at 536.  The BMS Defendants consented to the selection of Athene.  That was an administrator decision involving *how* to terminate the Plan.  And, consistent with that distinction, Plaintiffs challenge not the termination of the Plan but rather its termination by the purchase of an annuity from Athene.  *See* Compl. ¶ 264 ("Defendants breached [their] fiduciary duties of loyalty and prudence *when they selected Athene* as the annuity provider to receive Plaintiffs' pension liabilities for their own financial advantage.") (emphasis added).

Additionally, the BMS Defendants argue the Court must dismiss the portions of Count I alleging that they breached their fiduciary duty to monitor State Street.  BMS Mot. at 20–21.  The argument fails because Plaintiffs adequately allege that State Street breached its fiduciary duty, *see infra* Pt. V(A)(2), and that, at a minimum, the BMS Defendants had knowledge of the breach when State Street proposed Athene as the annuity providers.  These well-pleaded allegations are all that is required at this stage of the case.

### B.  Challenges to Count II Fail

In Count II, Plaintiffs allege in the alternative to Count I that if any Defendant was not a fiduciary, they are still liable for having knowingly participated in a fiduciary's breach in violation of ERISA.  Compl. ¶¶ 272–76.  The BMS Defendants argue that Count II must be dismissed because "the statutory provisions on which [Plaintiffs] rely do not authorize suit against nonfiduciaries charged with participating in a fiduciary breach."  BMS Mot. at 23. This

argument, too, fails.  In *Harris Trust & Saving Bank v. Salomon Smith Barney Inc.*, the Supreme Court permitted a plan's trustee to seek recovery of the plan's property from a non-fiduciary under 29 U.S.C. § 1132(a)(3).  530 U.S. 238, 249–250 (2000).  "That holding was premised in part on the observation that '[29 U.S.C. § 1132(a)(3)] makes no mention at all of which parties may be proper defendants—the focus, instead, is on redressing the act or practice which violates [ERISA].'"  *New York State Psychiatric Ass'n v. UnitedHealth Grp.*, 798 F.3d 125, 132 (2d Cir. 2015) (quoting *Harris Trust*, 530 U.S. at 246).  The same logic applies to 29 U.S.C. § 1132(a)(9), which provides Plaintiffs their cause of action in this case.  Like Section (a)(3), Section (a)(9) does not "limit . . . the universe of possible defendants."  *Harris Trust*, 530 U.S. at 246.  And Section (a)(9) authorizes the relief Plaintiffs seek in this action, including the posting of a security.  The Supreme Court's decision in *Mertens v. Hewitt Associates* is inapposite because it concerned a claim for *money damages* against a non-fiduciary under the cause of action provided by 29 U.S.C. § 1132(a)(1), which the Supreme Court commented seemingly does not permit an action for money damages at all.  508 U.S. 248, 254 (1993).

### C.  Challenges to Count III Fail

Count III alleges that the BMS Defendants violated their fiduciary duty by selecting State Street as the Plan's "independent fiduciary" for the purposes of the Athene transaction.  Compl. ¶¶ 277–82.  The BMS Defendants argue that the Court must dismiss Count III "because the Complaint fails to allege any facts plausibly suggesting that the BMS Defendants breached their fiduciary duties by appointing State Street."  BMS Mot. at 22.  The complaint alleges that State Street held substantial ownership interest in Bristol-Myers, Compl. ¶ 234, and in Apollo, *id.* ¶ 232.  Accepting those facts as true and drawing all inferences in Plaintiffs' favor, the Complaint supports a colorable inference that the BMS Defendants chose State Street not because State Street was best positioned to secure Plaintiffs' interests but because of its relationship with

22

Bristol-Myers and shared financial interest in Bristol-Myers' pecuniary gain from a PRT, in violation of the BMS Defendants' fiduciary duties to the former Plan.

### D. Challenges to Prohibited Transaction Counts Fail as to Counts IV and VIII, but Succeed as to Count V

ERISA bars a plan fiduciary from engaging in certain "prohibited transactions." For example, § 1106(a)(1) prevents a fiduciary from causing a plan to engage in a transaction if the fiduciary "knows or should know that such [a] transaction constitutes a direct or indirect" exchange of property or furnishing of services between the plan and a party in interest. 29 U.S.C. § 1106(a)(1)(C). 29 U.S.C. § 1002(14) defines a "party in interest," and excludes from that definition an entity that is a mere seller of a product (as opposed to an entity providing a service). 29 U.S.C. § 1106(b)(1) prohibits a fiduciary from "deal[ing] with the assets of the plan in his own interest or for his own account."

If a transaction is facially prohibited by ERISA, a fiduciary may nevertheless have acted lawfully if the transaction falls into one of myriad prohibited-transaction exemptions codified in 29 U.S.C. § 1108. For example, Section 1108(b)(2)(A) exempts an otherwise prohibited transaction with a party in interest if there is a "reasonable arrangement" resulting in "no more than reasonable compensation." Nevertheless, those exemptions function as affirmative defenses, and "Plaintiffs are not required to plead and prove that the myriad § 1108 exemptions pose no barrier to ultimate relief" to survive a motion to dismiss. *Cunningham v. Cornell Univ.*, 604 U.S. 693, 709 (2025).

The BMS Defendants challenge three counts charging that they engaged in a prohibited transaction: Count IV, Count V, and Count VIII.

Count IV alleges a violation of Section 1106(a) against the BMS Defendants with State Street as the identified party in interest. Compl. ¶¶ 283–290. The BMS Defendants argue that

23

the Court must dismiss Count IV because Plaintiffs failed to plead that the transaction did not fall within the exemption codified at Section 1108(2).  The Supreme Court's 2025 decision in *Cunningham* forecloses that argument.  604 U.S. at 709.

Count V also alleges a violation of § 1106(a) against the BMS Defendants, but with Athene as the identified party in interest.  Compl. ¶¶ 291–94.  The BMS Defendants argue that Athene was not a party in interest because Athene's only role was selling annuity contracts. BMS Mot. at 25.  The Court agrees.  An annuity contract is a product.  *NationsBank of N.C., N.A. v. Variable Annuity Life Ins. Co.*, 513 U.S. 251, 259 (1995).  Because Athene merely sold products, it is not a party in interest within the meaning of ERISA, and the Court will dismiss Counts V (and Count VII as against State Street, discussed *infra* at Part V.B.), which both rely on Athene being a party in interest.  Plaintiffs argue that Athene began providing a service to the Plan after the annuitization, and hence became a party in interest.  Opp. at 51–52.  This argument fails because, after the annuitization, there was no more Plan to which Athene could provide services.  *Hallingby*, 574 F.3d at 56 (explaining that the purchase of an annuity terminates a plan); 29 U.S.C. § 1002(14)(b) (describing a party in interest as a person who provides services to an employee benefit plan).

Lastly, Count VIII alleges that the Athene transaction was prohibited under 29 U.S.C. § 1106(b).  Compl. ¶ 306.  The BMS Defendants argue this count fails because they did not act as a fiduciary in the selection of Athene and that Bristol-Myers receiving surplus assets cannot constitute self-dealing.  BMS Mot. at 27.  Section 1106(b)(1) proscribes a fiduciary from "deal[ing] with the assets of the plan in his own interest or for his own account."  29 U.S.C. § 1106(b)(1).  Plaintiffs plausibly allege a violation of 29 U.S.C. § 1106(b) because they allege Defendants used Plan assets to purchase Athene annuities, specifically, in order to maximize

Bristol-Myers' profits and enhance State Street's business interest while jeopardizing the interests of Plaintiffs. *See Lowen v. Tower Asset Managements, Inc.*, 829 F.2d 1209, 1213 (2d Cir. 1987) (instructing that the protections of ERISA Section 406(b) (meaning 29 U.S.C. § 1106(b)) "be broadly construed"); *see id.* at 1214 (determining a plausible claim existed that a fiduciary violated § 1106(b)(1) because the fiduciary invested plan assets in a company in which it owned a substantial equity interest). Furthermore, the Court has already determined that the BMS Defendants' decision to use Athene as an annuity provider was an administrator function, not a sponsor function.

## V.    STATE STREET'S REMAINING ARGUMENTS

### A. Challenges to Count I Fail

Count I alleges that all Defendants violated the duty of loyalty and prudence by selecting Athene as the annuity provider. Compl. ¶¶ 260–71. State Street argues that it violated neither duty by proposing Athene as an annuity provider. State Street Mot. at 4. Count I survives State Street's motion to dismiss if the Complaint plausibly alleges that State Street violated either the duty of loyalty or the duty of prudence. The Complaint sufficiently alleges both.

### 1. The Duty of Loyalty

"To state a claim for breach of loyalty, a plaintiff must allege facts that permit a plausible inference that the defendant engaged in transactions involving self-dealing or [that] otherwise involve or create a conflict between the trustee's fiduciary duties and personal interests." *Bloom v. AllianceBernstein L.P.*, 725 F. Supp. 3d 325, 336 (S.D.N.Y. 2024) (quoting *Vellali v. Yale Univ.*, 308 F. Supp. 3d 673, 688 (D. Conn. 2018)). "A plaintiff must allege plausible facts supporting an inference that the defendant acted for the purpose of providing benefits to itself or someone else." *Sacerdote v. N.Y. Univ.*, 2017 WL 3701482, at *10 (S.D.N.Y. Aug. 25, 2017), *vacated on other grounds*, 9 F.4th 95 (2d Cir. 2021). Crucially, that a fiduciary's actions may

have tangentially benefitted the fiduciary does not alone support an inference that the fiduciary acted disloyally.  *See, e.g.*, *Patterson v. Morgan Stanley*, No. 16-cv-06568 (RJS), 2019 WL 4934834, at *12 (S.D.N.Y. Oct. 7, 2019) ("[A] plan fiduciary does not breach its duty of loyalty simply by offering the plan sponsor's financial products . . . .")); *Bloom*, 725 F. Supp. 3d at 337 (determining that plaintiffs failed to allege that fiduciaries breached a duty of loyalty because plaintiffs failed to "allege specific facts that directly demonstrate . . . a purpose other than providing benefits to participants").  In assessing this claim, "the Court must focus on facts as they existed at the time of the challenged transaction."  *In re Beacon Assocs. Litig.*, 745 F. Supp. 2d 386, 418 (S.D.N.Y. 2010).  Here, the challenged transaction, *i.e.*, the Athene transaction, occurred in early 2019.  Compl. ¶ 185.

The Complaint, and Plaintiffs in their brief, allege that State Street recommended Athene to bolster State Street's standing with Athene and Athene's owner, Apollo, to lay the foundation for future business collaborations.  Consistent with that theory, the Complaint includes various allegations tying State Street to Athene and Apollo.  The Complaint highlights that State Street has recommended Athene for ten PRTs since 2018, Compl. ¶ 228, that State Street and Apollo intend to jointly launch a first of its kind "actively managed exchanged-traded fund" (the "EFT"), *id.* ¶ 231, and that "State Street is also one of the largest shareholders of Apollo," particularly between 2020 and 2023, *id.* ¶ 232.  The Complaint also flags that "State Street provides custodial services for Athene's insurance products, according to its regulatory filings" and that State Street offers a financial product backed by Athene.  *Id.* ¶ 233.

The Court must ignore most of these allegations, however, because they occurred *after* the February 2019 Athene transaction.  Stripped of the post-2019 allegations, Plaintiffs allege that: (1) State Street has recommended Athene for at least one PRT; (2) State Street provides

26

custodial services for Athene's insurance products; and (3) State Street offers a financial product backed by Athene. Even drawing all inferences in Plaintiffs' favor, these allegations alone could not support an inference that State Street breached the duty of loyalty by recommending Athene. At most, they show that recommending Athene provided State Street tangential benefits, which courts in this circuit have uniformly determined falls short of supporting an inference that a fiduciary breached of the duty of loyalty. *See, e.g.*, *Bloom*, 725 F. Supp. 3d at 337. However, the Complaint also alleged that State Street violated its duty of loyalty on the same basis as the BMS Defendants—that as a significant shareholder in Bristol-Myers it would directly benefit from a transaction that returned the maximum amount of Plan assets to Bristol-Myers to use for other corporate purposes. As noted above at Part IV.A., these allegations are sufficient to survive a motion to dismiss.

In addition, the Court would deny State Street's motion to dismiss Count I in any event because Plaintiffs have plausibly alleged that State Street violated the duty of prudence.

### 2. The Duty of Prudence

ERISA imposes a duty of prudence requiring a fiduciary to exercise the "care, skill, prudence, and diligence under the circumstances . . . that a prudent [person] acting in a like capacity . . . would use." 29 U.S.C. § 1104(a)(1)(B). The applicable standard focuses "on a fiduciary's conduct in arriving at an investment decision, not on its results." *Pension Benefits Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt* ("*PGBC*"), 712 F.3d 705, 716 (2d Cir. 2013). But "a claim for a breach of fiduciary duty under ERISA may survive a motion to dismiss—even absent any well-pleaded factual allegations relating directly to the methods employed by the ERISA fiduciary—if the complaint alleg[es] facts that, if proved, would show that an adequate investigation would have revealed to a reasonable fiduciary that the investment at issue was improvident." *Id.* at 718. To succeed on

27

their claim that Defendants violated the duty of prudence, "Plaintiffs must allege facts sufficient to raise the plausible inference that Defendants breached their duty of prudence in view of the facts available *at the time* they made the challenged decisions." *Patterson*, 2019 WL 493483, at *9. If a complaint lacks factual allegations referring to a fiduciary's "knowledge, methods, or investigations at the relevant time . . . a claim alleging a breach of fiduciary duty may still survive a motion to dismiss if the court, based on circumstantial factual allegations, may reasonably 'infer from what is alleged that the process was flawed.'" *PBGC*, 712 F.3d at 718.

The complaint more than sufficiently alleges that—at the time of the Athene transaction—there was sufficient knowable information suggesting that State Street's process culminating in the selection of Athene was flawed. The Complaint shows that Athene was a new entrant to the market that conducted its first PRT (valued at $320 million) in August 2017. Compl. ¶ 227. State Street recommended Athene for the $2.6 billion PRT relevant to this case roughly two years later, a transaction that "increased Athene's [PRT] line of business by nearly 63%." *Id.* The transaction was conceivably the largest PRT Athene had taken on in its short corporate life. The Complaint also cites a January 2019 investigation into Athene by the State of New York for "conducting insurance business related to its Pension Risk Transfer business *without a license.*" ¶ 172 (emphasis added). The conduct was apparently so egregious that Athene was "ordered to pay a $45 million civil monetary penalty." *Id.*

Elsewhere, the Complaint alleges that Athene maintained an investment portfolio in "riskier, less liquid and more opaque [assets] . . . such as collateralized loan obligations ('CLOs')" than other traditional insurers. *Id.* ¶ 93. The Complaint cites a paper specifically naming Athene "as an example of an insurer with a shadow banking business" and a member of a group of "life insurance companies [that] holds some of the riskiest portions of the CLOs

issued by their own affiliate asset managers against virtually no capital." *Id.* ¶ 96–97. The Complaint highlights that "industry professionals" look to four "prevalent factors" when assessing an insurer's risk profile, and that all raised red flags for Athene. Compl. ¶¶ 114–137. And the Complaint cites a 2022 NISA Investments Advisors report indicating that beneficiaries whose pension benefit obligations were transferred to Athene suffered a 14% economic loss and that "on information and belief" risk data the report identified in 2022 concerning Athene "existed in 2018 and 2019." *Id.* ¶ 150 n.1.[10]

Crucially, Plaintiffs also allege that "[o]n information and belief, Defendants did not conduct an independent, impartial investigation aimed at identifying and selecting an annuity provider in Plan participants' best interests," *id.* ¶ 212, and that the "risk posed by Athene as of 2018–19 would have been ascertainable to sophisticated business entities with fiduciary obligations, such as [Defendants], had they conducted an independent, impartial investigation aimed to identify the safest annuity provider available," *id.* ¶ 213. *See PBGC*, 712 F.3d at 722 (affirming a district court's grant of a motion to dismiss and highlighting that a complaint alleging violation of the duty of prudence failed to allege that fiduciary did not conduct a proper investigation). The existence of these knowable facts pointing towards the risky nature of Athene creates a plausible inference that the process State Street used in selecting Athene did not comply with its duty of prudence.

State Street's arguments attempt to explain why all the risk factors Plaintiffs identify in their Complaint in fact present no cause for concern. To the extent such arguments are even appropriate in a 12(b)(6) motion, the Court remains unconvinced. Much of these counter

---

[10] State Street incorrectly argues that "Plaintiffs fail to allege that the 2022 NISA data are reflective of information known in 2019." State Street Mot. at 14.

arguments rely on a variety of self-described "judicially noticeable" documents that purport to show the financial health of Athene, but that nevertheless post-date the Athene transaction and hence do not bear on Plaintiffs' claim concerning the prudence of State Street's 2019 recommendation of Athene, even if it were appropriate for the Court to consider them on a motion to dismiss. *See, e.g.*, State Street Mot. at 13 n.23 (referencing Athene' 2023 10-K); *id.* n.27 ("Annual Statement for the Year Ended December 31, 2023"); *id.* at 17 n.37. At other instances, State Street relies on facts outside the Complaint without even attempting to explain why the Court could consider them on a motion to dismiss. *Id.* at 18 ("[T]he use of Bermudian reinsurers is commonplace . . . .); *id.* at 19 (contending that the New York investigation "did not relate in any way to the alleged riskiness of Athene's annuities"). And finally, State Street attempts to dispute facts alleged in the Complaint, although the Court must accept the Complaint's factual allegations as true. *Id.* at 18 ("Plaintiffs' factual premises are incorrect").

State Street elsewhere argues that Plaintiffs' duty of prudence claim fails because Plaintiffs failed to allege that a prudent alternative action was plausibly available. State Street Mot. at 19. But Second Circuit precedent does not require that—to state a claim for violation of the duty of prudence generally—a plaintiff must allege that a prudent alternative action was plausibly available. And where courts do look at the availability of prudent alternatives, it is in the context of claims alleging that a fiduciary violated the "continuing duty of some kind to monitor investments and remove imprudent ones.'" *Singh v. Deloitte LLP*, 123 F.4th 88, 93 (2d Cir. 2024) (quoting *Hughes v. Northwestern Univ.*, 595 U.S. 170, 185 (2015)); *see id.* at 94 (describing the standards for reviewing "recordkeeping complaints"); *Matousek v. MidAmerican Energy Co.*, 51 F.4th 274, 279 (8th Cir. 2022) ("[T]he way to plausibly plead a claim of this type is to identify similar plans offering the same services for less."). This is not such a case. And,

even if it were, Plaintiffs plausibly allege that a prudent alternative to the Athene transaction was not pursuing an annuitization at all.

Accordingly, State Street's motion to dismiss Count I is denied.

### B. Challenges to Prohibited Transaction Counts Fail as to Count VIII, but Succeed as to Counts VI and VII

Lastly, State Street challenges the prohibited transaction counts VI, VII, and VIII.  For the reasons discussed above at Part IV.D., Count VII is dismissed because Athene was not a party in interest.

Count VI alleges that "State Street caused the plan to engage in the annuity transaction," which "constituted a direct or indirect (i) exchange of property between the Plan, on the one hand, and the [BMS] Defendants, on the other hand; (ii) furnishing of services between the Plan and the [BMS] Defendants; and (iii) the transfer to, or use by or for the benefit of Bristol-Myers and The Pension Committee, of Plan assets."  Compl. ¶ 297.  State Street argues that this Count is irreconcilable with the Complaint's primary argument that the BMS Defendants paid Plan assets to Athene, not itself.  *Id.* ¶ 5.  And State Street argues that the reversion of surplus assets to the BMS Defendants after annuitization cannot be a prohibited transaction because ERISA expressly permits the reversion of plan assets.  29 U.S.C. § 1341(b)(3)(A)(i).  The Court agrees.

Count VI is seemingly predicated on the nebulous assertion that the mere fact of Bristol-Myers' receipt of the Plan's surplus assets upon annuitization amounted to a prohibited transaction.  The Court cannot accept that conclusion.   Excess assets always revert to an employer-sponsor after a plan terminates, including by annuitization.  *Thole*, 590 U.S. at 543; *Dist. 65, UAW v. Harper & Row, Publishers, Inc.*, 576 F. Supp. 1468, 1478–79 (S.D.N.Y. 1983).  And ERISA permits employer-sponsors to terminate plans via annuitization.  29 U.S.C. § 1341(b)(3)(A)(i); *id.* § 1344(d).  Plaintiffs' apparent theory underlying Count VI would mean

31

that a plausible allegation of a prohibited transaction exists virtually every time an employer terminates an ERISA-protected plan via an annuity if any surplus assets reverted to the employer, regardless of how the transaction was carried out or how secure the annuity provider was. That conclusion is irreconcilable with ERISA both (i) permitting termination via an annuity; and (ii) permitting an employer to recapture surplus assets upon termination. Accordingly, the Court will dismiss Count VI.

Finally, State Street's arguments challenging Count VIII are foreclosed by *Cunningham*. *See* State Street Mot. at 25 (relying on the now-reversed decision *Cunningham v. Cornell Univ.*, 88 F.4th 961 (2d Cir. 2023)).

## CONCLUSION

For the foregoing reasons, the motions to dismiss are GRANTED as to Counts V, VI, and VII. The motions are DENIED in all other respects.

The Clerk of Court is respectfully directed to terminate Dkt. Nos. 46, 50, 57, 68, & 79.


Dated:  September 29, 2025
        New York, New York


SO ORDERED.

MARGARET M. GARNETT
United States District Judge